363 So.2d 1266 (1978)
Michael WALTER
v.
Jack VALLEY, Del Thompson, George Malochee and Emile J. Bischoff and American Motorist Insurance Company.
No. 9182.
Court of Appeal of Louisiana, Fourth Circuit.
October 12, 1978.
James L. Bates, Jr., New Orleans, for Michael Walter, plaintiff-appellant.
Wood Brown, III, New Orleans, Trial Atty. for Snap-On Tools, Inc., defendant-appellee; Montgomery, Barnett, Brown & Read, New Orleans, of counsel.
Before SAMUEL, BOUTALL and SCHOTT, JJ.
*1267 BOUTALL, Judge.
This suit for damages for personal injury arises under the theory of products liability. Plaintiff Michael Walter was injured in an accident at his place of employment when an accessory tool he was using on a pneumatic power tool flew off and struck him in the eye. He sued several fellow employees and officials of Standard Paint & Varnish Company, his employer, and Snap-On Tools, Inc., the manufacturer of the tool. All claims were settled except against Snap-On Tools, Inc., and after trial the trial judge rendered judgment in favor of Snap-On, dismissing plaintiffs suit. He appeals.
The uncontested facts are that Walter was working as a truck driver for Standard Paint, and when not busy driving a truck, would engage in general duties, one of which was to assist in maintenance of the equipment. On August 27, 1974, he was assisting in the removal of a radiator, and was attempting to loosen some difficult nuts from it. The tools he uses are furnished by the employer, and in this case he looked into the tool box of the mechanic supervisor, Del Thompson, and obtained this pneumatically powered impact wrench, together with a universal joint and socket wrench. When he attempted to loosen the nut with these tools, the universal joint and socket flew off, striking him in the face and causing the subsequent loss of an eye.
The issues in this case are two-fold: Was the use of the tool a proper one which could be reasonably anticipated, and was there a duty on the manufacturer to warn a prospective user of the danger of such use?
The basic principles of product liability are set out in the case of Weber v. Fidelity & Casualty Insurance Company, 259 La. 599, 250 So.2d 754 (1971), and we quote at 250 So.2d 755:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. [Citations omitted.]
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them." Citations omitted.
These principles, as they apply to the issues before us, have been further explained in the case of Penn v. Inferno Manufacturing Corporation, 199 So.2d 210 (La. App. 1st Cir. 1967) at page 221:
" It is submitted that the laws of other jurisdictions as well as the laws of the State of Louisiana place a duty upon a manufacturer to know all of the dangerous qualities of the thing which he manufactures and he is responsible to make those dangers known to parties who purchase this product and this is so even though the product itself is not inherently dangerous."
In the recent case of Chappuis v. Sears Roebuck & Company, 358 So.2d 926 (La. 1978), the Supreme Court has further explained the duty of the manufacturer to take reasonable steps to warn a prospective user. We quote at page 930:
" Absolute liability upon a manufacturer whose product is useful, traditional, but which might become dangerous in some circumstances must be distinguished from the obligation here involved. There may be many tools or other products which become dangerous for normal use in certain conditions. But when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user."
*1268 The court held in that case that the failure to inform the user of the danger is "fault" referred to in Civil Code Article 2315 as the failure to warn falls below the reasonable standard of care. With these principles in mind we have proceeded to an examination of the facts.
In our case the accident occurred because Walter used loose-fitting manual tool accessories (universal joint and socket) on a pneumatic power impact tool instead of power tool accessories and when he operated the tool, the universal joint and socket flew off, striking him.
The trial judge has afforded us a detailed set of reasons for judgment in which he discussed the testimony of the various parties and reached a conclusion. On the whole, we agree with his analysis of the evidence and set no need to give our own detailed analysis. Instead, we simply quote his:
"The plaintiff's evidence against Snap-On Tools does not preponderate. The highlights of this evidence are:
"(1) Del Thompson owns two impact wrenches, one with a half-inch drive and the other with a one-inch drive. He has impact sockets and accessories for the larger one, but not for the smaller wrench.
"In one place, Thompson testified that he knew impact accessories were available, knew they were different from manual accessories, but he did not know why. He had (sic)[1] been advised of the need for them, he would have bought impact accessories for this wrench when he bought the wrench. On cross he admitted that he knew impact sockets and accessories were available, but did not buy them because he could not afford them. Further, though in error, he knew the impact accessories were black and manual accessories were chrome-colored. These chrome accessories looked unsafe to him when he used them, but he took the chance of using them anyway. `They were wobbly when used before.'
"He would have stopped plaintiff using this wrench, had he known he was using it, because it was not the correct tool for the job.
"The plaintiff testified that he is not a licensed mechanic but he likes to work on his own car, and he has some of his own tools. He primarily, with the help of his brother built a Corvette completely. He would have done the job himself, but it would have taken him longer. He has tuned old engines, worked on brake systems, changed motors and transmissions. He is, therefore, skilled enough to know what tools should be used for mechanic's work. He had used this particular wrench before. The retaining ring on the front end of the spindle was not on it when he used this wrench this time.
"On this occasion, he complained to Thompson and to Bischoff that something was wrong with this damn thing; sockets kept falling off it and he thought there should have been something to hold them on with. He told them it was dangerous without that retaining ring being on it, but Thompson told him the wrench was made that way to facilitate mechanics with greasy hands to change sockets easily. He noticed the wrench had no locking device and this disturbed him.

"Expert Witnesses: A. J. Scardino, Jr. accepts the manufacturer's suggestions or instructions as to design and use and users of impact wrenches should use the property (sic)[2] (impact) attachments on the tool. His primary interest as safety engineer is to see to it that the tool is used according to the manufacturer's recommendations. This tool was not. Impact accessories have a locking device that prevents them from pulling apart or flying off. The improper use of this tool was the cause of this accident. When injured, the plaintiff was not using this wrench in the normal, intended manner of use. There are numerous manufacturers *1269 of impact wrenches and none of them have warnings printed on the tool. The Snap-On catalogue is in evidence (as Defense Exhibit 7) and does not use the word safety in its warning, therefore it is not a "safety warning". The bold black print does say use correct sockets. Page 10 of the catalogue does use and warn of safety requirements, so he was wrong.
"L.L. Denson said his investigation showed that this tool should not be used with manual accessories, but rather with impact accessories. The hallmark of American Tool manufacturers is to achieve interchangeability of parts, but in this particular case this is bad. The whole industry is wrong here. The manufacturer is not responsible for the abuse of a tool nor for its improper use. He did not test this tool; did not check or examine competitors' products either; he has never used an impact wrench himself. This manufacturer complied with ANSI (National standards). He is a mechanical engineer and he knows ANSI standards are set with the help of the American Mechanical Engineers Society and that the standards committee is made up with both manufacturers and users present and in mind.
"Raymond G. Knudsen was the engineer with Snap-On Tools who helped design this wrench. He is a graduate chemical engineer, but he has long, long years of drafting and mechanical and design engineering experience. He is present chairman of Committee B107-4 of ANSI's Board. He has been on that National Board since 1965 and his committee is made up of representatives of manufacturers and users. He designed the Snap-On ring for the end of the drive shaft or spindle on this wrench. He insisted on it being included in the design as a safety retainer device. He tested this wrench model, using the wrong accessories as did the plaintiff. With the ring on, the universal joint held on but the socket came off. ANSI standards call for 6 pounds minimum pull-off. His test showed 8-20 pounds. This is not a very powerful fall, (sic)[3] on the contrary it is rather low-powered in the industry. The plaintiff was not making proper application of the tool; this, plus the fact that the accessories he used were worn down and without the Snap-On ring. These factors caused this accident. There has never been another accident like this one reported to the company since it began manufacturing this tool.
"Such evidence causes the Court to conclude that the plaintiff has not carried the burden of proof required of him in this case. In the plaintiff's case against his fellow employees (settled), his proof is adequate, as is his proof of the nature and extent of his injuries and damages. However, in his case against Snap-On Tools, plaintiff's evidence does not preponderate."
The facts clearly show that the accident occurred as a result of improper use of the tool. The pneumatic power tool itself did not cause the injury, but the improper use of hand tool accessories on the power tool caused the injury. The tools actually used, along with the accessories supposed to be used on the power tool, were placed in evidence. The power tool now has a steel split ring retainer on the end of the drive shaft (device used to hold the accessories in a snug position on the drive shaft and keep them from slipping off), and the plaintiff testified that there was no split retainer on the tool when he used it. Plaintiff also testified that the universal joint and sockets fit very loosely on the drive shaft (they were worn from prior use) and our examination indicates this is so. He was so concerned that he sought the advice of his superiors as to whether or not he should use the tool in that condition. Fault for the missing retainer ring and condition of the tools would be attributable to Walter's employer, not to the manufacturer. We conclude, as did the trial judge, that this was improper use of the tool.
*1270 However, plaintiff's argument before us goes beyond that issue. He contends that potential users of the tool should have been warned of the dangers inherent in using accessories and sockets other than those designed specifically for use on this tool. He notes with some justification that the drive shaft of the power tool ends in a one-half inch square drive, and that numerous hand tool accessories and socket wrenches also use a ½ inch square drive. He contends that a user of such a tool may use manual attachments as he did without knowing of the danger of such application, and that this danger could have been prevented by the manufacturer with appropriate warning.
It goes without saying that sufficient warnings of this possibility would tend to reduce the recurrence of such accidents. Similarly, the construction of the power tool with some unique power drive such that hand fittings would be impossible to fit thereon, would certainly prevent such an occurrence from happening again. But our inquiry is based upon the imposition of a reasonable duty to warn potential users of hazards, and is not an absolute guaranty as noted in the above quoted law. The evidence in this case is to the effect that this pneumatically powered impact tool is designed for use by professional mechanics who are expected to have some knowledge of their application. These tools are not sold in stores, but only by salesmen representatives licensed by Snap-On. The use of the tool is dependent upon an adequate compressed air supply, and can only be used economically by persons who would use it sufficiently for its limited purposes. It is not the sort of thing that an ordinary home mechanic would possess or ever use. Nevertheless, we conclude that it should be considered that an individual such as this plaintiff who does occasional mechanical assistance around a professional shop, may use this tool on occasions in his work. At the same time, it is hardly conceivable to us that an ordinary person would pick up and use such a tool without acquiring some instruction as to its use. We especially note that the mechanic supervisor from whose tool box plaintiff obtained the tool testified that had plaintiff asked him to use this tool he would have refused him. Additionally, plaintiff testified that he did notice the loose arrangement of the accessories on the tool and did ask his superiors whether he could use the tool, and was told it was all right to use it. We cannot conclude that the manufacturer could reasonably anticipate that a tool such as this, designed for professional use, would be used by a person unskilled and uninstructed as to its proper use, and hence we find no unreasonable violation of a duty to warn in this case. It seems to us that the evidence tends rather to show that the plaintiff knew that something was wrong with his intended use of this tool, with which he was unfamiliar, and the fault herein is shared by him and his employer, rather than the manufacturer.
For the above reasons, we affirm the judgment of the trial court at plaintiff's costs.
AFFIRMED.
NOTES
[1] It is apparent from the testimony that these two words are transposed and should read "Had he been advised".
[2] "Property" should be "proper".
[3] "Fall" should read "tool".