835 F.2d 1113
 Prod.Liab.Rep.(CCH)P 11,648
Melvin WHITE, etc., et al., Plaintiffs,
v.
AMOCO OIL COMPANY and Hattie G. Clifton, Defendant-Third
Party Plaintiff- Appellee, Cross-Appellant,
v.
MISSION INSURANCE CO., Defendant-Appellant-Appellee,
v.
HILL-ACME CORP., The Deutsch Co. and Western Employers
Insurance Co., Third Party Defendants-Appellants,
Cross-Appellees.
 No. 86-3466.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 19, 1988.
As Amended Feb. 22, 1988.
Rehearing Denied Feb. 23, 1988.
 
 Wood Brown, III, New Orleans, for plaintiffs.
 Arthur H. Andrews, Baton Rouge, La., for Amoco & Hattie Clifton.
 Charles A. O'Brien, III, Baton Rouge, La., for Deutsch, Western & Hill-Acme.
 Appeals from the United States District Court for the Middle District of Louisiana.
 Before GOLDBERG and JONES, Circuit Judges.*
 GOLDBERG, Circuit Judge:
 
 I. FACTS
 
 1
 On November 14, 1980, on a Louisiana sugarcane plantation, a tractor brushedagainst a liquified petroleum gas ("L.P. gas") tank and broke the piping used to remove the L.P. gas from the tank. L.P. gas leaking from the tank reached plaintiff Melvin White, who was working nearby. The gas ignited, severely burning White. The tank's excess flow valve should have shut off the flow of L.P. gas from the tank but the valve failed to function because the break occurred in the valve itself and the valve's mechanism was carried away.
 
 
 2
 1. The Tank. During 1951 or 1952 Hattie G. Clifton contracted with defendant Amoco Oil Company's predecessor, General Gas Corporation,[1] for placement of a one thousand gallon L.P. gas tank on her sugarcane plantation. General Gas Corporation purchased the tank and related equipment, and installed and delivered them ready for use. During the nearly thirty years between installation of the tank and the accident, Amoco, or its predecessors or subsidiaries, filled and serviced the tank. Amoco was responsible for maintenance of the tank.
 
 
 3
 2. The use of the tank. Everett J. Caballero leased the sugarcane plantation from the landowner, Hattie G. Clifton. On September 12, 1978, Mrs. Clifton transferred her lease of the tank to Caballero. Caballero's employees used the leased tank to refill a smaller tank on a trailer. Caballero's employees then used L.P. gas from the smaller trailer mounted tank to burn leaves and debris from the harvested cane stalks before sending them to the mill.
 
 
 4
 3. The excess flow valve. An excess flow valve is required in L.P. gas installations. The purpose of an excess flow valve is to prevent leakage of gas in the event of an accidental breakage in the discharge line. Mrs. Clifton's tank had a coupling welded into the front, near ground level, for attachment of a discharge line. In installing this tank General Gas Company screwed a brass excess flow valve, manufactured by The Deutsch Co. ("Deutsch"),[3] directly into this coupling. General Gas Company attached other steel valves and a semi-rigid rubber hose to the excess flow valve to complete the discharge line.
 
 
 5
 To explain exactly how the accident happened we must explain the design of the excess flow valve. The valve consisted of a pipe containing an excess flow mechanism. A spring in the excess flow mechanism was designed to close the excess flow valve whenever the flow of L.P. gas exceeded a predetermined rate.
 
 
 6
 Between the upstream end of the pipe containing the excess flow mechanism and its fourth thread, the interior diameter of the pipe was greater, and the pipe's walls were thinner. At the fourth thread, the interior diameter of the pipe decreased, and the pipe's wall thickness increased, forming a "seat." This seat held the excess flow mechanism in place.
 
 
 7
 The excess flow valve installed had eight threads available on each end.[3] The installer, however, screwed the upstream end of the excess flow valve into the tank only four turns, leaving the remaining threads exposed. The point of the greatest mechanical stress in the discharge line is the point where the line intersects the tank. In this case, as would be expected, the break in the discharge line occurred at that point. Because the excess flow valve was only screwed into the tank's coupling four turns, the break occurred before the seat. The force of the escaping L.P. gas therefore carried the excess flow mechanism away and, as a result, the mechanism could not function. If General Gas Company had screwed the excess flow valve into the tank five or five and one-half turns the break in the pipe would have occurred after the seat and valve would have functioned as intended.
 
 
 8
 The rigid piping and semi-rigid hose in the discharge line protruded beyond the end of the tank. Amoco did not install any crash posts or fence to protect the tank from impact.
 
 
 9
 4. Because of the accident. The parties stipulated before trial, and the district court judge found, that:
 
 
 10
 On the day of the accident, a tractor driven by Robert Blivins, a co-employee of Melvin White, brushed against the head of the propane tank; and as a result of the ensuing collision, caused the tank's excess[ ] flow valve to break off at the outlet of the tank.
 
 
 11
 ....
 
 
 12
 The excess flow valve was only partially screwed into the tank.
 
 
 13
 ....
 
 
 14
 The excess flow valve broke at the point of greatest mechanical stress; that is the point where it screwed into the tank.
 
 
 15
 Rec. vol. VI at 377-78, 380-81.
 
 II. COURSE OF THE ACTION
 
 16
 The injured individual, Melvin White, filed suit. Before trial, however, the defendants settled with White for a total of $2,100,000.[4] In the settlement agreement, each of the defendants reserved the right to try the matter to the court to apportion liability for the $2,100,000 paid to White. Hill Acme Corporation and American Universal Insurance Company, however, assigned their rights to Deutsch's insurer, Western Employers Insurance Company. At the conclusion of Amoco's case the district court granted a judgment under Fed.R.Civ.P. 41(b) dismissing all claims against Hattie G. Clifton. The district court's task was, therefore, to apportion liability for the $2,100,000 between Amoco and Deutsch. The district court ruled that both Amoco and Deutsch were liable under negligence and products liability theories--apportioning liability 55% to Amoco and 45% to Deutsch. If it could have the district court would have assigned 90% of the fault for the accident to the tractor driver, Robert Blivins. Under Louisiana law, which controls in this diversity action, however, White's employer, Caballero, and White's co-employee, Robert Blivins, are immune from a tort action for negligence.[5] In addition, Louisiana courts have interpreted the Louisiana statute as barring reduction of an employee's recovery for his employer's negligence and for the negligence of a co-employee.[6] As a result, under Louisiana tort law, the parties responsible for 10% of the fault, Amoco and Deutsch, must bear the entire liability.[7]III. BASIS FOR AMOCO'S LIABILITY
 
 
 17
 The district court found Amoco liable, in negligence and in products liability,[8] because: (1) "Amoco did not properly install ... the excess flow valve"; (2) Amoco failed to protect the system in some manner; and (3) Amoco designed the system so that the valve and hose stuck out beyond the tank. Rec. vol. VI at 389.
 
 
 18
 1. Installation of the excess flow valve. The court found that Amoco's predecessor failed to properly install the excess flow valve. As discussed above, the excess flow valve would not function properly unless the installer screwed it into the tank at least five turns. Amoco's predecessor, however, screwed the valve in only four turns. As a result the valve failed to function.
 
 
 19
 Recognized engineering standards in use for many years before the installation required that a one and one-quarter inch pipe be screwed in 4.83 turns to form a "hand tight" joint and 7.90625 turns to form a "tight joint."[9] Experts testified that, in an installation like this, involving L.P. gas, industry standards would require the full engagement "tight joint" of nearly eight threads. Because General Gas violated recognized industry standards, the district court's finding that General Gas was negligent in failing to screw the valve in enough turns to form a tight joint was not clearly erroneous.[10]
 
 
 20
 2. Lack of protection around the tank. The district court concluded that Amoco should have put some protection around the tank considering the dangerous nature of the product involved and the use made of the tank. The district court found that crash posts or a fence could have provided protection that would have averted the accident that occurred.
 
 
 21
 The experts agreed that the tank's installer is responsible for providing protection. Several experts also testified that the installer should have provided protection for this tank even though it was located in an area of relatively low traffic. The district court's finding that Amoco's predecessor was negligent in failing to provide protection is not clearly erroneous.
 
 
 22
 3. Protrusion of piping system beyond the tank. The rigid piping and semi-rigid hose in the discharge line protruded beyond the end of the L.P. gas tank. The district court also concluded, on the basis of expert testimony, that the discharge line should not have extended out beyond the tank as it did. Although the flexible portion of the hose had to extend beyond the end of the L.P. gas tank, the rigid piping and semi-rigid hose could have been assembled in such a way that they did not extend beyond the end of the L.P. gas tank. The court found that the extension of the rigid piping and semi-rigid hose allowed the accident to happen. These findings are not clearly erroneous.
 
 IV. BASIS FOR DEUTSCH LIABILITY
 
 23
 The district court found Deutsch liable because the "warning ... given was ... inadequate and improper, considering the dangerous use for which the excess flow valve was to be used, and the specific types of applications, specifically the L.P.G. gas in this particular case." The district court found that the warning given did not warn the user, without regard to whether the user was an expert, that the valve's design required that it be screwed in at least five threads. The court "noted" that the valve was thinner where the excess flow valve was located and that the valve's design made it impossible for the installer to see if the valve itself was properly and totally screwed into the tank.
 
 
 24
 1. Warning given. The "warning" that Deutsch relied on was contained in their catalog. The catalog included a picture of a cutaway version of the excess flow valve which showed the seat of the valve at around the fourth thread. The catalog also stated that:
 
 
 25
 When used in containers, the valve should always be installed so that the excess flow mechanism is within the container. In this position, flow will be unrestricted into the container. An excessive discharge from the container will be prevented by the valve.
 
 
 26
 The catalog neither mentioned the importance of screwing the excess flow valve in past the fifth thread nor explained what could happen if an installer failed to screw the valve in past the seat of the excess flow mechanism.
 
 
 27
 2. Warning required. A product's manufacturer has a duty to warn consumers of any dangerous propensities which may foreseeably accompany normal use of the product.[11] "Normal use" includes reasonably foreseeable misuse of the product.[12] The duty to warn exists even though the product is not otherwise defective;[13] failure to adequately warn is a defect. The manufacturer, however, need not warn of dangers that users know or should know of or dangers that are or should be obvious to ordinary users.[14] In addition, manufacturers need not warn sophisticated users of dangers that they should know of.[15]
 
 
 28
 3. The installer was a sophisticated user. Whether a user is sophisticated is ordinarily a question of fact for the jury to decide. Fincher v. Surrette, 365 So.2d 860, 863 (La.App.1978). In this case, however, the parties stipulated that:
 
 
 29
 At all times pertinent hereto, Amoco was in the business of selling propane gas as well as assembling, maintaining and leasing propane gas tanks.
 
 
 30
 The district court adopted this stipulation as part of its findings. Rec. vol. VI at 375. Amoco, on appeal, contends that the stipulation did not establish that the installer, General Gas Company, was sophisticated.[16] Deutsch counters that they believed that all stipulations concerning design, installation, filling and maintenance of the tank referred to Amoco and its predecessors. Deutsch also notes that the sophistication of General Gas was not included in the list of disputed issues and suggests that this was because the parties thought it was covered by the stipulation on Amoco's expertise. At trial the parties and the court frequently referred to Amoco and General Gas interchangeably. For example the court said that:
 
 
 31
 Now, in this particular case, the court will treat Amoco and the Deutsch defendants, as the court will refer to that group, as manufacturers since each of them had acted as a manufacturer, either of a part or of the system involved in this particular case.[17]
 
 
 32
 General Gas was engaged in the business of installing L.P. gas tanks, H. Emerson Thomas, an expert witness called by Amoco, testified that certain individuals in Amoco's and General Gas Company's organizations would be experts in the field of L.P. gas, including selection of tanks, selection of components, and installation of an excess flow valve. Even if the stipulations did not establish General Gas Company's expertise, the district court's finding that General Gas was a sophisticated user is not clearly erroneous.
 
 
 33
 4. Was the warning given adequate for a sophisticated user?
 
 
 34
 Deutsch designed the valve with the interior seat for the excess flow mechanism at approximately the fourth thread. Thus if the installer screwed the valve in four threads, or less than four threads, and the discharge line broke at the point of maximum stress, the intersection with the tank, the seat of the excess flow mechanism would not be in place and the mechanism would be carried away and not function. That is what happened. From looking at the exterior of the valve an installer cannot tell that it has to be screwed in at least five turns to function properly. That is, the installer cannot tell how the excess flow mechanism is installed inside the valve because he cannot look through the metal wall of the valve. He can, of course, tell that he has not screwed the valve in the full number of available threads, that is eight.
 
 
 35
 Even though the industry standard required a "tight joint" of almost eight turns, beyond "hand tight" of four turns, this does not establish that Amoco knew or should have known that the excess flow valve would not function at all if tightened only four turns. The four turns did establish a gas tight seal. Only a warning would make an installer aware that if he did not fully tighten the valve it would not function if broken.
 
 
 36
 The court found that Deutsch could have included a warning on the valve itself, in the catalog, or in the package advising the user that the valve had to be screwed in at least five threads to function properly. The district court stated that:
 
 
 37
 It may sound contradictory on the one hand for the court to say that there was not proper instructions on the part of the Deutsch Defendants, and then also to find that Amoco or its predecessor failed to properly install. But as has been noted during the course of this trial, the people involved on behalf of Amoco were in fact not ordinary users. These were people that were involved in the overall operation of installing this type of equipment.
 
 
 38
 Rec. vol. VI at 391-92.
 
 
 39
 Although General Gas Company's violation of the industry standard of eight threads for full engagement provides sufficient basis for Amoco's liability it does not necessarily absolve Deutsch of its duty to warn. To paraphrase what this court recently said in In re Incident Aboard the D/B Ocean King, 813 F.2d 679 (5th Cir.1987), "in the days of comparative fault, [General Gas Company's] failure to observe [an industry standard] does not cure the manufacturer's defective warnings concerning the installation of their product." Id. at 687. The district court's finding that Deutsch's warning was inadequate is not clearly erroneous.
 
 V. CONCLUSION
 
 40
 The district court found Amoco liable because Amoco did not properly install the excess flow valve, failed to protect the tank and left the discharge line sticking out beyond the tank. The district court found Deutsch liable because Deutsch did not give an adequate warning. We have threaded our way through this case by careful examination of the record and a minute analysis of the findings of fact and conclusions of law. We find the problem not of a knotty variety but one resolved very clearly from the record. The district court judge's findings place no embroidery whatsoever upon the fabric of facts. The stitches were taken with care and the conclusion is made of untearable cloth. We therefore AFFIRM the district court judgment apportioning liability for the $2,100,000 total settlement amount 55% to Amoco and 45% to Deutsch.
 
 
 
 *
 Due to his death on October 19, 1987, Judge Robert Madden Hill did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. Sec. 46(d)
 
 
 [1]
 Amoco Oil Company eventually succeeded to ownership of General Gas and assumed all rights and obligations that General Gas had in the premises. Amoco, therefore, stands in the shoes of General Gas
 
 
 [2]
 Deutsch's insurer, Western Employers Insurance Co., and Deutsch's excess insurer, Mission Insurance Co., are parties but are not referred to separately from Deutsch
 
 
 [3]
 The valve also had one and one-half additional threads known as "imperfect threads."
 
 
 [4]
 There were six defendants: Amoco, the owner of the tank and successor to the tank's installer; Hill Acme Co. and The Deutsch Co., the corporations responsible for the design and manufacture of the valve; Deutsch's insurer, Western Employers Insurance Co.; Deutsch's excess insurer, Mission Insurance Co.; and Mrs. Hattie Clifton, the landowner
 Amoco paid $937,500 of the $2,100,000 settlement. Western Employers Insurance Company and Mission Insurance Company jointly paid an additional $937,500 on behalf of Deutsch. Hill Acme Corporation and American Universal Insurance Company jointly paid $100,000. Hattie G. Clifton and her insurer, The Travelers Insurance Company, jointly paid the remaining $125,000.
 
 
 [5]
 The Louisiana Workers' Compensation Statute La.Rev.Stat.Ann. Sec. 23:1032 (West 1985), provides that:
 The rights and remedies herein granted to an employee or his dependent on account of an injury ... shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury....
 
 
 [6]
 The district court relied on Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.Ct.App.1985), writs denied, 481 So.2d 1330 (La.1986). In Franklin the court held that a trial court could not reduce an injured employee's tort award for his employer's negligence. Id. at 557-58. After the district court decision in this case, a Louisiana appellate court held that a trial court could not reduce an injured employee's tort award for his co-employee's negligence. Marzula v. White, 488 So.2d 1092, 1098-99 (La.Ct.App.1986)
 In Nance v. Gulf Oil Corp., 817 F.2d 1176 (5th Cir. 1987), this court held that the trial court must submit the question of the immune employer's proportionate share of fault to the jury. See id. at 1180-81. The Nance court reasoned that failing to submit the issue of the employer's fault might affect the relationship between the negligent third party's fault and the employee's fault and might therefore affect the payment required under the Louisiana liability statute. Id., see La. Civ. Code Ann. art. 2324 (West Supp. 1988) ('a judgment debtor shall not be liable for more than the degree of fault to a judgment creditor to whom a greater degree of fault has been attributed'). Because the parties in this case all stipulated that the plaintiff was not negligent, and because this case was tried to the court without a jury, Nance does not affect the trial court's decision.
 
 
 [7]
 See Marzula v. White, 488 So.2d 1092 (La.Ct.App.1986) (injured employee's co-employee was negligent but immune; trial court erred by reducing injured employee's recovery from third party for the negligence of the injured employee's co-employee; negligent third party had to bear 100% of injured employee's damages); Franklin v. Oilfield Heavy Haulers, 478 So.2d 549, 557 (La.App.1985) (trial court erred in reducing employee's recovery for his employer's negligence; trial court should have held the two defendants before the court liable for the full amount of the injured employee's damages)
 
 
 [8]
 The district court found that both Deutsch, as manufacturer of the valve and Amoco, as installer of the tank, were manufacturers of part of the system involved in the case
 
 
 [9]
 Marks Engineering Handbook 8-19, 8-187. The experts agreed that these industry standards were plus or minus tolerances of approximately one thread
 
 
 [10]
 The district court, trying the case without a jury, stated its findings of fact. This court cannot set aside the district court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985)
 
 
 [11]
 American Mutual Liability Insurance Co. v. Firestone Tire & Rubber Co., 799 F.2d 993, 994 (5th Cir.1986); Ducote v. Liberty Mutual Insurance Co., 451 So.2d 1211, 1213 (La.App.1984) (citing Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978))
 
 
 [12]
 Johnson v. Tenneco, Inc., 752 F.2d 160, 162 (5th Cir.1985) (applying Louisiana products liability law); LeBouef v. Goodyear Tire & Rubber Co., 623 F.2d 985, 989 (5th Cir.1980) (same)
 
 
 [13]
 Foster v. Marshall, 341 So.2d 1354, 1362 (La.App.1977)
 
 
 [14]
 Id
 
 
 [15]
 Id. (instructions that power saw should be grounded to protect user from electrical shock were sufficient warning of danger of electrocution for a sophisticated user); see Bradco Oil & Gas Company v. Youngstown Sheet & Tube Co., 532 F.2d 501, 504 (5th Cir.1976), cert. denied, 429 U.S. 1095, 97 S.Ct. 1111, 51 L.Ed.2d 542 (1977) (applying Louisiana law; pipe manufacturer need not have warned experienced oil and gas producer of danger of pipe embrittlement from exposure to hydrogen sulfide gas where producer knew of embrittlement danger and should have known of inadequacy of smell test for hydrogen sulfide); Foster v. Marshall, 341 So.2d 1354, 1362 (La.App.1977) (manufacturer of agricultural equipment not required to warn dealers or users that they should periodically inspect and replace cotter keys)
 
 
 [16]
 Amoco does not even argue that we should look to the sophistication of the unidentified individual who actually installed the valve. Louisiana courts appear to have rejected that approach. See Walter v. Valley, 363 So.2d 1266, 1270 (La.App.1978). In Walter, a Louisiana court held that in the case of a product designed for professional use and not sold in stores, the manufacturer need not anticipate that the product will be used by an unskilled and uninstructed person. Id. A professional user or one instructed in the use of the tool would not have done what this plaintiff did. Id. As a result the manufacturer did not violate a duty to warn in failing to warn the plaintiff not to do what he did. Id
 
 
 [17]
 Rec. vol. VI at 386. Clearly Amoco did not install or manufacture anything. Instead the district court said Amoco to refer to Amoco and its predecessors, including General Gas Company. The court also said "Amoco did not properly install the piping system; but more specifically, the excess flow valve in this particular case." Rec. vol. VI at 389. Finally the district court said "the people involved on behalf of Amoco were in fact not ordinary users. These were people that were involved in the overall operation of installing this type of equipment." Id. at 392