NATIONAL MARINE SERVICE INCORPORATED, Plaintiff-Appellant,

v.

PETROLEUM SERVICE CORPORATION, Defendant,

v.

KAISER ALUMINUM AND CHEMICAL CORPORATION, et al., Defendants-Appellees.

No. 83–3259.

United States Court of Appeals, Fifth Circuit.

July 16, 1984.

---

Terriberry, Carroll, Yancey & Farrell, Edward S. Bagley, New Orleans, La., for plaintiff-appellant.

Taylor, Porter, Brooks & Phillips, John I. Moore, Baton Rouge, La., for Kaiser Aluminum.

Gelpi, Sullivan, Carroll & Laborde, Norman C. Sullivan, Jr., New Orleans, La., for St. Louis Ship.

Before JOHNSON, HIGGINBOTHAM, and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

On August 31, 1979, a multi-purpose tank barge carrying 1,920 short liquid tons of concentrated sulfuric acid sank during unloading operations at a dock on the Mississippi River in Gramercy, Louisiana. The barge was destroyed, resulting in stipulated damages totalling $735,000; plus the

value of the entire cargo of sulfuric acid, which was lost.

The ensuing litigation spawned this appeal, which requires this Court to determine whether assumption of the risk is a valid defense to a strict liability action brought under federal maritime law or whether the defense of assumption of the risk is subsumed within the doctrine of comparative fault as set forth recently by the *en banc* court in *Lewis v. Timco, Inc.*, 716 F.2d 1425 (1983) (*en banc*). We hold that the defense of assumed risk must be determined under the principles of comparative fault set forth in *Lewis*.

I. BACKGROUND AND COURSE OF PROCEEDINGS

National Marine Service, Inc. (NMS) is an owner and operator of several tank barges and towing vessels. In 1975, NMS entered into a contract with St. Louis Ship, which obligated St. Louis Ship to design and manufacture four barges. These four barges, including the barge in question (the NMS 1950), were designed as multi-purpose barges allegedly capable of transporting a variety of liquid cargoes.

Like all four barges constructed for NMS, the NMS 1950 was constructed with six individual tanks, three port and three starboard. The NMS 1950 was designed so that by manipulating a series of valves (called sluice valves) that connected the six tanks, all cargo would flow to the two forward tanks. It was thought desirable for the barge to be designed in this fashion so that a single pump could be used to pump and unload all the cargo from the forward tanks during unloading operations. However, due to improper design by St. Louis Ship, the barge trimmed aft instead of forward. In other words, the center of gravity was aft of the center line rather than forward of the center line. This caused the cargo to flow to the stern rather than the bow tanks, resulting in what was

referred to as "down by the stern incidents".

After NMS had taken possession of the NMS 1950 and experienced these "down by the stern incidents", NMS contacted St. Louis Ship and sought advice. St. Louis Ship suggested that the problem could be corrected by installing a sea valve or a sea chest in the rake compartment of the barge.[1] St. Louis Ship stated that by opening the sea valve during unloading operations the rake compartment could be flooded so that the barge would list forward and cause the center of gravity to be toward the bow rather than the stern. According to St. Louis Ship, once the rake compartment was flooded and the sluice valves were opened, the liquid cargo would then flow into the bow cargo compartments. It was necessary, of course, to discharge from the forward tanks promptly or the barge would sink bow first when the bow tanks were filled. NMS agreed with St. Louis Ship's suggestion and, at their own expense, installed the NMS 1950 with the sea valve or sea chest. Indeed, NMS had been operating the NMS 1950 under this procedure for over three years prior to the incident in question.

In August 1979, Allied Chemical Company (Allied Chemical) sold 1920 short liquid tons of sulfuric acid to Kaiser Aluminum and Chemical Company (Kaiser Aluminum) and agreed to deliver the sulfuric acid to Kaiser Aluminum's plant on the Mississippi River at Gramercy. Allied Chemical hired NMS to transport the cargo and the NMS 1950 was loaded with the sulfuric acid and transported to the Kaiser Aluminum dock. Allied Chemical had required NMS to provide a tankerman to supervise the discharge of the sulfuric acid. NMS contacted Kaiser Aluminum but was advised that barges discharging at the Kaiser Aluminum dock must be supervised by a Kaiser Aluminum tankerman. Indeed, Kaiser Aluminum had a continuing service contract with a tankerman service, Petroleum Ser-

---

**1.** The rake compartment is a compartment on the extreme bow of the vessel and forward of the forwardmost cargo tank.

vice Corporation (PSC), and NMS was informed that PSC would unload the vessel. Hence, the NMS tankerman telephoned a supervisor with Kaiser Aluminum and advised him that it was necessary to flood the rake compartment before discharging the cargo. Although there is substantial dispute as to whether this message was delivered to the PSC tankerman, the district court resolved the dispute concluding that NMS, as plaintiff, had failed to demonstrate that Kaiser Aluminum failed to deliver the message to PSC.

On August 31, 1979, the PSC tankerman, provided by Kaiser Aluminum, undertook unloading operations. The PSC tankerman read the written instructions on the NMS 1950 relative to unloading, but the instructions did not warn of the NMS 1950's tendency to have "down by the stern incidents" nor did the instructions inform the tankerman of the need to flood the rake compartment during ordinary unloading operations. He opened all cargo compartment sluice valves and the discharge valves but did not flood the rake compartment. A Kaiser Aluminum employee (a dockman) was with the PSC tankerman and assisted him in preparing to discharge. However, just as the unloading operations were to begin, a hose utilized during discharge operations developed a leak and the operation was immediately shut down to attempt to repair the existing hose or to obtain a replacement hose.

The PSC tankerman ultimately went ashore to obtain a replacement hose. Additionally, the Kaiser Aluminum dockman left the dock and sat in his truck in a parking lot adjacent to the dock area. The PSC tankerman left the sluice valves open while he was ashore some twenty to twenty-five minutes even though the rake compartment had not been flooded.[2] The tankerman noted no listing on the barge when he left. However, when he returned to the barge he noticed a severe aft list. He immediately began closing all of the sluice valves but it was too late and the barge sank, stern first.[3]

NMS, owner of the barge, filed this action against the PSC tankerman and Kaiser Aluminum, owner of the dock and buyer of the sulfuric acid. PSC filed third party complaints against St. Louis Ship, designer-manufacturer of the barge, and Allied Chemical, seller of the sulfuric acid. Finally, Kaiser Aluminum filed a cross claim and counter claim for the loss of the cargo of sulfuric acid aboard the barge at the time of the sinking.

The case was tried before the trial court, without a jury, on the issue of liability. The trial court concluded that St. Louis Ship had improperly and negligently designed the barge. However, the trial court further concluded that NMS had knowledge of the defect for a considerable length of time and continued using the barge in face of the known risk. Under these circumstances, the trial court concluded that NMS had assumed the risk of the defective design and could not recover from St. Louis Ship. As to the fault of the plaintiff, NMS, the trial court concluded that any fault on the part of St. Louis Ship in designing the barge was attributable to NMS in view of NMS' assumption of the risk. The trial court found that the negligent design assumed by NMS contributed to the sinking of the NMS 1950 to the extent of 25%. Further, the trial court found NMS guilty of independent fault in negligently chartering a defectively designed barge to Allied Chemical, failing to give specific warning

---

**2.** The PSC tankerman had been aboard the barge some thirty or forty minutes after the sluice valves were opened before he left the barge.

**3.** The cause of the sinking was summarized by the trial court in the following manner:

Because sulfuric acid has a much higher specific gravity and therefore is much heavier than other cargoes which the barge sometimes carried, a full load left a large vacant space in all of the tanks. The design of the barge was such that the center of gravity of the cargo was aft of the center of bouyancy of the barge. Therefore, when the sluice valves were open, the acid gravitated to the open space in the stern tank causing the barge to sink by the stern.

Record, Vol. IV at 993.

of the defect to Kaiser Aluminum, failing to furnish specific instructions on how the cargo could be safely discharged, and posting unclear and inadequate instructions on the barge. The trial court concluded that NMS' independent fault contributed an additional 40% to the incident, thus making NMS' total fault 65% (25% for defective design and 40% independent negligence). The district court found PSC guilty of fault to the extent of 35% for failing to maintain surveillance of the barge after the sluice valves had been opened. Interpreting a federal regulation requiring surveillance, the trial court concluded that, if the PSC tankerman had not left the barge, the list would have been apparent to him in time to take corrective action, that the tankerman was at fault in failing to close the sluice valves before leaving the barge, and that the tankerman was at fault in failing to detect the barge list before he left the barge to obtain a replacement hose. Finally, the district court concluded that Kaiser Aluminum was guilty of no fault. The trial court concluded that NMS failed to prove that Kaiser Aluminum did not deliver the message to the PSC tankerman to flood the rake compartment prior to unloading. The district court also determined that Kaiser Aluminum had no obligation to maintain surveillance over unloading operations once it engaged a competent tankerman. This appeal followed.

## II. ASSUMPTION OF THE RISK

In *Lewis v. Timco*, 716 F.2d 1425 (1983) (*en banc*) the *en banc* court faced the issue of whether the doctrine of comparative fault applies in a products liability suit initiated under federal maritime law. The *en banc* court concluded that the "maritime principle of comparative fault is applicable in maritime cases that urge strict liability ...," and noted that the "practical result" of its decision was that "comparative fault will apply to all maritime products cases." *Lewis*, 716 F.2d at 1427, 1427 n. 1. Hence, it is firmly established in this Circuit that, in federal maritime products cases, the plaintiff's fault must be compared with the fault of a strict-

ly liable defendant. The critical issue presented to this Court is whether, in making this comparison of fault, a distinction should be drawn between mere contributory negligence and assumption of the risk.

It is beyond cavil, that mere contributory negligence and true assumption of the risk are theoretically distinct notions of fault. Comment n. to Section 402(A) of the Restatement (Second) of Torts, distinguishes the two defenses. *See also, Bell v. Jet Wheel Blast*, 709 F.2d 6, 7 (5th Cir. 1983); and *Rodrigue v. Dixilyn Corp.*, 620 F.2d 557 (5th Cir.1980). Simply put, mere contributory negligence connotes a plaintiff's failure to act as a reasonable person would have acted under the same or similar circumstances regardless of whether plaintiff actually knew of a risk, whereas true assumption of the risk contemplates the plaintiff's actual awareness of the dangerous condition and the plaintiff's voluntary decision to encounter the known risk.

Experience has demonstrated, however, that the niceties of these theoretical distinctions are often lost in the practical application of these defenses. Indeed, in discussing the distinctions between contributory negligence and assumption of the risk, the Restatement authors stated: "The same kind of conduct frequently is given either name, or both. Ordinarily it makes no difference which the defense is called." Restatement (Second) of Torts, 496 A, Comment (d). Whether the theoretical distinction is applied in a particular case, however, can have meaningful consequences. For example, in the case at bar, if NMS' fault is deemed mere contributory negligence, the trial court would be required to apply the comparative fault scheme established in *Lewis*. In effect, plaintiff's recovery would be diminished, not barred, by the amount of plaintiff's contributory negligence. On the other hand, if NMS' conduct is characterized as assumption of the risk, a quite different result would follow, since assumption of the risk has traditionally constituted an absolute bar to recovery.

As the *en banc* court noted in *Lewis,* "comparative fault has long been the accepted risk-allocating principle under the maritime law, a conceptual body whose cardinal rule is uniformity." *Lewis,* 716 F.2d at 1428. Moreover, the majority of state courts and federal courts sitting in diversity that have faced similar issues have concluded that application of comparative fault principles results in a more just decision than application of the all or nothing defenses of the past. *See e.g., Keegan v. Ancorn Inns, Inc.,* 606 F.2d 35 (3rd Cir. 1979); *Pan Alaska, Etc. v. Marine Construction and Design Co.,* 565 F.2d 1129 (9th Cir.1977); *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir.1976); *Trust Corp. of Montana v. Piper Aircraft Corp.,* 506 F.Supp. 1093 (D.Mont.1981); *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (1983); *Star Furniture Co. v. Pulaski Furniture Co.,* 297 S.E.2d 854 (W.Va. 1982); *Kaneko v. Hilo Coast Processing,* 65 Hawaii 447, 654 P.2d 343 (1982); *Kennedy v. City of Sawyer,* 4 Kan.App.2d 545, 608 P.2d 1379, 1386 (Ct.App.), *aff'd,* 228 Kan. 439, 618 P.2d 788 (1980); *Baccalleri v. Hyster Co.,* 287 Or. 3, 597 P.2d 351 (1979); and *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978).

As we have seen, this Court and a number of state courts that have considered similar issues have decided to abandon the all or nothing defenses of old and currently adhere to principles of comparative fault. The reasons militating in favor of abandonment of all or nothing defenses were stated well by the Ninth Circuit:

> Such "all or nothing" defenses are inequitable in their operation because they fail to distribute responsibility in proportion to fault and place upon one party the entire burden of loss for which two are, by hypothesis, responsible. If, for example, the user's conduct in failing to discover or guard against the product's defect is highly irresponsible and the product's defect slight, it offends our sense of justice and fair play to impose the whole loss on the manufacturer in the name of imposing the burden of defec-

tive products on the manufacturer as one of the cost of doing business. There is no reason why other consumers in society in general should bear that portion of the burden attributable to the plaintiff's own blameworthy conduct.

*Pan Alaska, Etc. v. Marine Construction and Design, Co.,* 565 F.2d 1129, 1139–40 (9th Cir.1977).

■ We too are persuaded that no distinction should be made between assumption of the risk and contributory negligence, but that the plaintiff's conduct (whether theoretically mere contributory negligence or assumption of the risk) should be analyzed solely under the principles of comparative fault set forth in *Lewis.* Such a result, we are convinced, best comports with the overwhelming trend in federal and state courts and advances the primary goals of maritime law—uniformity and predictibility. *See, Lewis,* 716 F.2d at 1428. We find further support for this conclusion in the Supreme Court's decision in *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939), wherein the Court stated:

> The incongruity and practical embarrassments in the application of a rule that the negligence in the one case bars recovery, while that in the other only reduces the recoverable damages, are evident. The common law is consistent in holding that both contributory negligence and assumption of risk are defenses. But other considerations apart, it seems inconsistent, and an impracticable refinement, to apply the rule for which petitioner contends in a system of law which maintains the comparative negligence rule to the fullest extent.

*Id.* at 267.

■ In light of our conclusion that the all or nothing defense of assumption of the risk should not have been applied, we must remand this proceeding for the trial court's apportionment of fault under *Lewis.* While the trial court apparently did assess NMS' percent of fault in its judgment, we are not persuaded that we can interpret

those findings with confidence and determine whether the trial court would have made the same findings under an application of pure comparative fault. We are convinced, in sum, that the safer course is to remand this proceeding to the district court for a reallocation of fault. The district court is, of course, entitled to determine whether new evidence should be presented or whether the determination can be made on the existing evidentiary record.

## III. KAISER ALUMINUM'S NEGLIGENCE

NMS argues that the district court erred by failing to find Kaiser Aluminum at fault. Specifically, NMS maintains that Kaiser Aluminum was negligent in failing to properly supervise the unloading operations and for failing to deliver the message concerning unloading procedures from the NMS tankerman to the PSC tankerman. We disagree.

### A. Supervision

NMS agrees with the trial judge's conclusion that "Kaiser cannot be held liable for failing to provide surveillance once PSC assumed control." NMS argues, nevertheless, that the PSC tankerman relinquished control of the vessel by leaving the barge and that the duty to supervise the barge reverted to Kaiser Aluminum. However, a review of the trial judge's findings of fact on this issue indicate that NMS' argument must fail.

■ The trial judge, in concluding that Kaiser Aluminum was not negligent, made the following findings:

> After the tankerman assumed control of the barge the duty to maintain surveillance was not a joint obligation of Kaiser and PSC, but rather was solely that of PSC. Kaiser paid PSC for its superior knowledge of tankering procedures and of barges in general. PSC was never relieved of its responsibility for maintaining a watch over the barge, nor did it share that responsibility with Kaiser. There is no evidence that when the tankerman left the barge he asked Kaiser's dockman to watch the barge. The tank-

erman and the dockman left the barge almost simultaneously without any discussion of surveillance during their absence. The barge had been moored at the dock for several hours without incident. There was no reason for the dockman to suspect that the tankerman had altered the situation detrimentally, particularly when the expert tankerman was leaving the barge, unconcerned about its safety.

Record, Vol. IV at 999. In light of these findings, which we cannot conclude are clearly erroneous, the district court's decision not to hold Kaiser Aluminum negligent for failure to supervise the unloading operations must be affirmed. Fed.R.Civ.P. 52(a).

### B. Failure to Deliver the Message

■ NMS maintains that Kaiser Aluminum was negligent for failing to deliver the message from NMS to the PSC tankerman, instructing him to flood the bow rake before discharging the barge. While there was conflicting evidence on this point, the trial judge held that plaintiff, NMS, had not sustained the burden of proving that Kaiser Aluminum failed to deliver the message. NMS maintains that the trial court erroneously placed the burden of proving a negative on NMS and, hence, should have placed the burden of proving delivery of the message on Kaiser Aluminum. NMS continues by arguing that if the burden of proof had been placed upon Kaiser Aluminum, they would have been unable to demonstrate that the message was delivered to the PSC tankerman and the trial judge would have found Kaiser Aluminum negligent.

Whether or not the trial court applied an erroneous burden of proof need not be decided. The trial judge expressly concluded that delivery of the message would not have avoided the sinking of the vessel. In his opinion, the trial judge stated:

> It must be noted that if the message had been delivered and the tankerman had flooded the bow rake, and if thereafter events had occurred as they did, the barge would have sunk by the bow. Thus, the only significance of the deliv-

ery of the message is the possibility that the tankerman would have been put on notice that the NMS 1950 was not a typical barge and therefore would not have acted as she did. This is highly speculative, especially considering that the NMS phone message carried no warning of the consequences of the failure to flood the bow and no indication of the barges propensity to sink.

Record, Vol. IV at 998, n. 2. Clearly, the trial court concluded that delivery of the message would have had no bearing on the sinking of the NMS 1950. Hence, NMS is hard pressed to argue that Kaiser Aluminum should be held negligent for failing to deliver the message. Accordingly, this contention is rejected.

CONCLUSION

Since the district court erroneously applied the all or nothing bar rule of the defense of assumed risk, we vacate the district court's decision on liability and remand for a reallocation of fault. However, we affirm the district court's conclusion that Kaiser Aluminum was not negligent in failing to supervise properly the unloading operations of the NMS 1950 or for failing to deliver the message from NMS to PSC.

VACATED and REMANDED IN PART, AFFIRMED IN PART.