**INTEROCEAN SHIPS, INC., a Delaware Corporation, Plaintiff**

**v.**

**SAMOA GASES, a Corporation, Defendant**

High Court of American Samoa
Trial Division

CA No. 123-85

December 22, 1992

Before RICHMOND, Associate Justice, TAUANU'U, Chief Associate
Judge, MATA'UTIA, Associate Judge.

Counsel:     For Plaintiff, William H. Reardon and Don L. Marshall
             For Defendant, Gata E. Gurr

On Liability:

        This action arose out of an explosion which occurred aboard the
purse seiner Ocean Pearl on November 21, 1983.  This explosion, which
killed the captain of the vessel and injured six crew members, was caused
when the crew attempted to "jump start" the stalled engine of the ship by
using a combination of oxygen from cylinders supplied by the defendant
Samoa Gases and an ether-based starter fluid.  Several actions were filed
in various jurisdictions by the injured crew members and the widow of
the Ocean Pearl's captain, naming plaintiff Interocean Ships, Inc.
("Interocean") as defendant.  Interocean settled these claims and then
brought actions against the companies which supplied the diesel fuel, the
starter fluid, and the oxygen cylinders to the Ocean Pearl.  All of these
suits have been settled, save the one presently before the court.  The
court bifurcated this trial, postponing the determination of damages until
a decision was reached regarding the liability of Samoa Gases.

        Interocean asks us, for the first time, to apply the doctrine of
strict products liability to a proceeding within admiralty jurisdiction.  We
accept Interocean's invitation.  Applying the principles of comparative
fault (comparative negligence) to this strict products liability action, we

hold Samoa Gases liable in proportion to the amount by which its fault furthered the accident.

## FACTS

On November 16, 1983, the Ocean Pearl sailed from Pago Pago, American Samoa, on a fishing voyage. Two days later, while the vessel was on the high seas, the diesel propulsion engine of the Ocean Pearl stopped, due to tainted diesel fuel which was taken on while in Pago Pago. On November 21, 1983, after three days on the high seas unsuccessfully attempting to restart the engine, the decision was made to utilize a combination of ether-based starter spray and pure oxygen gas in an attempt to "jump start" the engine.

Purse seiners normally carry cylinders of oxygen and acetylene for use in routine welding and splicing jobs which occasionally arise during their fishing trips. Samoa Gases had supplied the Ocean Pearl with the oxygen cylinders for this purpose. These cylinders were stored on the Ocean Pearl's "wet deck," a sub-deck which, as its name implies, is exposed to harsh, wet conditions.

The cylinders were brought into the engine room, and their valves were opened so that their contents would discharge into the air filter of the engine. At the same time, the starter fluid was sprayed into the air filter. The first attempt met with small encouragement, so a third cylinder of oxygen was placed next to the original two, and another attempt was made. This resulted in a low-order explosion, which severely burned the captain and six crew members and damaged the engine room and the engine itself. The captain subsequently died of his injuries.

Interocean, the owner of the Ocean Pearl, is seeking indemnification from Samoa Gases, under the theory that the latter is liable for failure to provide a warning label on its oxygen cylinders.

## DISCUSSION

I. *Justifications for Strict Products Liability in Tort*

"The purpose of [strict products liability in tort] is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Greenman v.*

*Yuba Power Products, Inc.* 377 P.2d 897, 901 (Cal. 1962). The seminal *Yuba Power Products* case laid the foundation for the application of strict products liability in tort, as opposed to similar actions based upon negligence or breach of warranty. Allowing such an action directly, in tort, obviated the need for plaintiffs to meet the cumbersome and difficult requirements imposed by these latter theories of recovery, such as proof of specific acts of negligence or privity with the defendant. *See, e.g., Schuldies v. Service Machine Co.*, 448 F. Supp. 1196 (E.D. Wis. 1978); *see generally*, Annotation, *Products Liability-Strict Liability*, 13 A.L.R.3d 1057, at § 2 (1967).

The main theoretical justifications for strict products liability are that: (1) the seller or manufacturer is in a position to spread the cost of accidents evenly among the purchasers of the products; (2) the burden of liability will provide incentives for the production of safer goods; and (3) the marketer of a product has made an implied representation that the product, when put to its intended use, will not be unreasonably dangerous and will be at least as safe as other, comparable products. *See* W. Prosser & P. Keeton, *The Law of Torts* § 98, at 693-94 (5th ed. 1984); *McKay v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir. 1983). Such considerations motivated the American Law Institute to draft the Restatement (Second) of Torts § 402A (1965), which sets forth the elements of strict products liability.

It is generally said that strict liability looks at the product itself and determines if it is defective, whereas negligence looks at the act of the manufacturer and determines if it exercised ordinary care. *See, e.g., Syrie v. Kroll International*, 748 F.2d 304 (5th Cir. 1984). This distinction, however, is not so clear in failure-to-warn cases, as will be discussed below.

## II. *Application of Strict Products Liability in Admiralty*

It is well settled that an action for recovery under a theory of strict products liability may be entertained by a court sitting in admiralty jurisdiction. The Supreme Court has stated that it "join[s] the Courts of Appeals in recognizing products liability, including strict liability, as part of the general maritime law." *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 865 (1986). The vast majority of circuit courts considering the question of strict products liability in admiralty have applied § 402A in their analyses. *See Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129 (9th Cir. 1977); *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir.

1972); *Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121 (3d Cir. 1984); *Vickers v. Chiles Drilling Co.*, 822 F.2d 535 (5th Cir. 1987); *McKee v. Brunswick Corp.*, 354 F.2d 577 (7th Cir. 1965). Indeed, the Ninth Circuit has called § 402A "the best and most widely-accepted expression of the theory of strict products liability." *Pan-Alaska*, 565 F.2d at 1135.

We agree with the reasoning of these courts and accept § 402A as the rule for strict products liability in our admiralty jurisdiction. Indeed, the need for consistency within the law of admiralty virtually demands this decision. The issue of the applicability of § 402A to a non-admiralty action is not presently before the court, and we do not consider it at this time.

## III. *Application of Comparative Fault in Admiralty*

Comparative fault (also termed comparative negligence), long recognized in admiralty in actions for unseaworthiness (*see Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406 (1953)), under the Jones Act (46 U.S.C. § 688), the Death on the High Seas Act ("DOHSA") (46 U.S.C. § 761, 766), and the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. §§ 901 *et seq.*; *see Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir. 1983) (en banc)), has been applied also to strict products liability actions under maritime law. *See Pan-Alaska Fisheries*, 565 F.2d at 1138; *Lewis*, 716 F.2d at 1428; *National Marine Service, Inc. v. Petroleum Service Corp.*, 736 F.2d 272, 277 (5th Cir. 1984). "The admiralty rule in personal injury cases is, in effect, one of comparative negligence." *Lewis*, 716 F.2d at 1428 (quoting G. Gilmore & C. Black, *The Law of Admiralty* 500 n.70 (2d ed. 1975)).

*Lewis* put forward several arguments for the incorporation of comparative fault into admiralty. They are important enough to cite at length. First, the court noted, DOHSA explicitly instructs courts to apply comparative fault. Failure to apply the same to strict products liability actions could create a situation in which

> when a worker's death on the high seas was caused by a defective product, the recovery would be reduced on account of the worker's negligence, but not when he was only injured. Moreover, because DOHSA applies to accidents occurring beyond a marine league from shore plaintiffs would be treated differently depending upon where a fatal accident occurred.

*Lewis*, 716 F.2d at 1428.

> Second, the court pointed out that

> > [w]hen a negligent plaintiff, negligent defendants, and the manufacturer of a defective product are all held jointly responsible for injuries, plaintiff's negligence would diminish his potential recovery from the negligent defendants but not from the manufacturer. If the liability was joint and several, plaintiff could recover the entire amount of his damages from the manufacturer. From the plaintiff's perspective, assuming the solvency of the manufacturer, it is as if there were no doctrine of comparative fault with respect to the negligent defendants as well. From the manufacturer's perspective, contribution might be available, but somebody would bear more than his share of the damages. In other words, erosion of the comparative fault principle, once started in the products liability field, will cut at the legs of negligence as well.

*Id.*

> Finally,

> > [t]he traditional doctrine of seaworthiness will also likely be affected. If a vessel is unseaworthy because a product was defective, we will be forced to decide whether to hold the manufacturer of the product to a stricter standard of liability than the vessel owner, traditionally a near insurer in cases of unseaworthy vessels. Even more taxing will be the categorization process as seamen attempt to escape the comparative fault of the traditional theory of unseaworthiness and label their case products cases. Ultimately, there would be the inquiry of whether a vessel is not itself a product. . . . [S]hould we reject comparative fault, many maritime torts of our circuit will become product cases with the companion problem that the courts of this circuit would be favored over more convenient courts by seamen with a choice of forum.

*Id.* at 1429.

While the applicability of such federal legislation as the Jones Act or DOHSA has not yet come before this court, our failure to apply comparative fault to admiralty actions within this jurisdiction would erode the "cardinal mark" of maritime law, universality. *See id.* at 1428.

There is no consensus outside of admiralty on the application of comparative fault to strict products-liability actions. The most frequently mentioned objection of courts which oppose the incorporation of comparative fault is "that it would be inappropriate to inject negligence concepts into an area of liability which is based, not on negligence principles, but on a no-fault concept. . . ." Annotation, *Applicability of Comparative Negligence Doctrine to Actions Based on Strict Liability in Tort,* 9 A.L.R.4th 633, 636, at § 2 (1981). This objection, however, seems particularly inappropriate in failure-to-warn actions, as courts have generally recognized that the difference between such cases and negligence cases is more apparent than real.

In addition, the Legislature of American Samoa has directed that we apply comparative fault to actions for personal injury or property damage. A.S.C.A. § 43.5101. Thus, we do not contravene the will of the Legislature by incorporating this principle into admiralty.

The rule of comparative fault can be stated quite simply: "[T]he defendant is strictly liable for the harm caused from his defective product, except that the award of damages shall be reduced in proportion to the plaintiff's contribution to his own loss or injury." *Pan-Alaska Fisheries,* 565 F.2d at 1139.

## IV. *Restatement (Second) of Torts § 402A*

Restatement (Second) of Torts § 402A describes the elements of a successful strict products-liability action. It reads:

> 1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>> a) the seller is engaged in the business of selling such a product, and

82

b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

2) The rule stated in Subsection (1) applies although

a) the seller has exercised all possible care in the preparation and sale of his product, and

b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Application of § 402A, then, is predicated on several distinct determinations of both fact and law. In the instant case, it must be shown that: (1) Samoa Gases was engaged in the business of selling oxygen tanks (this is not in dispute); (2) the oxygen tanks reached the users (here, the crew of the Ocean Pearl) without substantial change in the condition in which they were sold; and (3) the oxygen tanks were in a defective condition, i.e., were unreasonably dangerous to the crew of the Ocean Pearl.

A. *No substantial change in condition sold*

§ 402A comment g reads, in part:

The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

> Safe condition at the time of delivery by the
> seller will, however, include proper packaging . . . and
> other precautions required to permit the product to
> remain safe for a normal length of time when handled
> in a normal manner.

Interocean, therefore, bears the burden of proof by a preponderance of the evidence that the cylinders were unlabelled when they left the control of Samoa Gases. *See* Restatement (Second) of Torts § 402A comment g (1965); *Molett v. Penrod Drilling Co.*, 826 F.2d 1419, 1424 (5th Cir. 1987). This fact, "like all others, may be established by either direct or circumstantial evidence. . . . Identification of a specific defect is often impossible, and the plaintiff need create only a reasonable inference that the defective condition of the product was present at the time of manufacture." *Molett*, 826 F.2d at 1424. Interocean's witness Robert Parkerson stated that he brought oxygen bottles on board the Ocean Pearl and that these bottles had no warning labels. *Deposition of Robert Parkerson* at 30. This was the only direct evidence put forward by Interocean to prove that the tanks were not labelled when they left the control of Samoa Gases. Samoa Gases offered no direct evidence on the matter. We find that Interocean has met its burden of proof in this issue and that Samoa Gases failed to deliver properly-labelled oxygen cylinders to the Ocean Pearl.

However, even if it were shown that warning labels were affixed to the cylinders when they left Samoa Gases' hands, Interocean's case might still survive. The general rule is that subsequent changes in the condition of the product (here, the possible wearing away of the labels while they were being stored on the "wet deck") do not relieve the seller or manufacturer of strict liability if the changes were foreseeable and did not unforeseeably render the product unsafe. *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188, 195 (8th Cir. 1981), *cert. denied sub nom. St. Louis-San Francisco Railway Co. v. Vanskike*, 455 U.S. 1000 (1982) (citing *Hales v. Green Colonial, Inc.*, 490 F.2d 1015, 1020 (8th Cir. 1974)). Put another way:

> To constitute a defect it is not necessary that the
> ultimate "defect" as it appeared and developed shortly
> prior to the accidental occurrence existed in that form
> at the time possession was surrendered. . . . The rule
> is that if the manufacturer or assembler surrenders
> possession and control of a product in which change
> will occur, or in which the change can be anticipated

> to occur so as to cause a product failure, the existence
> of a defect at the vital time is established.

*Whitehead v. St. Joe Lead Co.*, 729 F.2d 238, 250 (3d Cir. 1984) (citing *Sharp v. Chrysler Corp.*, 432 S.W.2d 131, 136 (Tex. Civ. App. 1968)). *See also Saupitty v. Yazoo Mfg. Co.*, 726 F.2d 657, 659 (10th Cir. 1984); *Scott v. White Trucks*, 699 F.2d 714, 716 (5th Cir. 1983); *C&S Fuel, Inc. v. Clark Equipment Co.*, 552 F. Supp. 340, 345 (E.D. Ky. 1982).

While this issue of foreseeability of change has not been raised by courts sitting in admiralty, the United States Supreme Court has noted that "[d]rawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *East River S.S.*, 476 U.S. at 864-65. Indeed, "[i]n maritime tort cases courts traditionally apply principles of maritime law, as informed by common law tort developments . . . unless a policy determination has been made by the Congress." *Lewis*, 716 F.2d at 1427 (citations omitted). Thus, even if we are incorrect in finding the lack of labels at the time of delivery, it is not a fatal error. Interocean's witness Robert Parkerson testified by deposition that he examined the oxygen cylinders immediately prior to the accident and found no warning labels. *Deposition of Robert Parkerson* at 28-29. Furthermore, Interocean's exhibits, which included photographs taken on board the Ocean Pearl, establish that there were no labels on the tanks after the explosion. Interocean's witnesses asserted that it was unlikely that any labels would have been burned away by the explosion. Thus, we further find that the oxygen tanks were unlabelled directly prior to their use before the explosion. The foreseeability of their condition reinforces our finding that Samoa Gases breached its duty to provide a sufficient warning to the crew of the Ocean Pearl.

## B. *Defective Condition/Unreasonably Dangerous*

There is little or no difference between "defective condition" and "unreasonably dangerous" as applied under § 402A. Several courts and, indeed, the Restatement (Second) of Torts itself, consider these two terms synonymous; a finding of one will preclude the necessity of finding the other. *Pavlides v. Galveston Yacht Basin* 727 F.2d 330, 338 n.13 (5th Cir. 1984) (adopting the position of § 402A in considering "defective condition" as synonymous with "unreasonably dangerous"); *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1087 n.20 (5th Cir. 1973) (same), *cert. denied* 419 U.S. 869 (1974).

But regardless of the label applied, the finding is a prerequisite to Samoa Gases' liability. In actions based upon failure to warn, however, the term "strict liability" may be inappropriate, for in these cases, the "threshold question [is] whether a duty to warn exists." *Hull v. Eaton Corp.*, 825 F.2d 448, 454 (D.C. Cir. 1987). This is, in essence, a negligence inquiry. The First Circuit has said:

> [S]ince the duty to warn under both theories is a function of, chiefly, what the manufacturer knows or should know about the danger necessitating the warning, the two theories often seem similar. In fact, other courts have concluded that the strict liability duty to warn is so largely informed by negligence principles as to be essentially identical to the negligence duty.

*Kotler v. American Tobacco Co.*, 926 F.2d 1217, 1231 (1st Cir. 1990). *Accord Hull*, at 454; *Gonzalez v. Volvo of America Corp.*, 752 F.2d 295, 300 (7th Cir. 1985); *Birchfield v. International Harvester Co.*, 726 F.2d 1131, 1139 (6th Cir. 1984); *Flaminio v. Honda Motor Co., Ltd.*, 733 F.2d 463, 466 (7th Cir. 1984); *Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980).

The D.C. Circuit put it thusly:

> [S]trict liability in tort imposes liability for unreasonably dangerous products regardless of the fault of the defendant. If a product is dangerous only because it has not been labelled properly, however, the fault of the defendant *is* relevant to the question whether the labeling is adequate. Such a product is unreasonably dangerous only if it was reasonably foreseeable that the product, as labelled, would cause injuries.

*Young v. Up-Right Scaffolds, Inc.*, 637 F.2d 810, 814 (D.C. Cir. 1980) (emphasis in original).

And Prosser states:

> [N]otwithstanding what a few courts have said, a claimant who seeks recovery on [a theory of failure to warn] must, according to the generally accepted view, prove that the manufacturer-designer was negligent.

86

There will be no liability without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn. . . . Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability described as the sale of a product in a defective condition, subject, however, only to the defenses and other limitations on liability applicable to strict liability rather than negligence.

W. Prosser & P. Keeton, *The Law of Torts* § 99, at 697 (5th ed. 1984).

Section 402A comment j itself suggests the application of a negligence standard to failure to warn cases. It reads, in part:

In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. . . . Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, *or by the application of reasonable, developed human skill and foresight should have knowledge*, of the presence of the ingredient and the danger (emphasis added).[1]

The Seventh Circuit noted that "[t]his similarity [between negligence and strict liability in failure to warn cases] exists because the language and concepts of reasonableness which determine unreasonable risk under Section 402 A are the same concepts used in a negligence case." *Gonzalez*, 752 F.2d at 300.

---

[1] The illustrative example of allergies in comment j probably reflects the fact that strict products liability originated to protect consumers from impure food and drink. *See* Restatement (Second) of Torts § 402A comment b.

Some courts have refused to apply an identical standard to negligence and strict-liability actions. They tend to hold the seller or manufacturer to a higher duty of care in a strict products liability action than in a negligence action; this should not, however, distract from the fact that they, too, speak in the negligence language of standard of care. *See, e.g., Pavlides*, 727 F.2d at 338 (manufacturer is to be held to standard of an expert); *Borel*, 493 F.2d at 1088 (same); *Anderson v. Owens-Illinois, Inc.*, 799 F.2d 1, 4 (1st Cir. 1986) (same).[2]

It should be noted, however, that for the issue at hand, the standard of knowledge to which Samoa Gases is held is of little or no consequence.[3] The danger of oxygen's volatility when combined with

---

[2] Although *Anderson* did state that the manufacturer or seller was to be charged with expert knowledge in products liability cases based upon failure to warn, as opposed to mere trade knowledge, that same court later stated that *Anderson* stood for the proposition that "since even expert knowledge does not rise to the level of perfectly developed knowledge, a showing must still be made that the state of knowledge supports the conclusion that a certain risk is knowable--or what the law calls 'reasonably foreseeable.'" *Kotler*, 926 F.2d at 1232.

[3] Perhaps the main import of equating the strict liability duty with the negligence duty is that it makes analysis under either standard equivalent. *E.g., Gracyalny v. Westinghouse Electric Corp.*, 723 F.2d 1311, 1317 n.11 (7th Cir. 1983)(impliedly incorporating § 388 of the Restatement (Second) of Torts and its duty of care into § 402A analysis, and vice versa); *Russel v. GAF Corp.*, 422 A.2d 989, 992 (D.C. App. 1980)(same). The Restatement (Second) of Torts § 388 reads:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

petroleum products and/or open flame or sparks is not so esoteric that an expert should be aware of it while a "mere merchant" could remain safely ignorant. The danger should be apparent to anyone in the field of selling compressed gases, expert or not.[4] It is clear that such a seller has a duty to warn of the inherent dangers of its products. However, this duty is not static and independent of its audience. Rather, it is influenced by those towards whom it is owed.

---

      (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

      (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

However, it is important to keep in mind that substantial differences between common-law negligence and strict products liability do exist outside of the area of standard of care.

    [4] There was some mention at trial that the label proffered by Samoa Gases as being of the type that was affixed to the cylinders was in compliance with Occupational Safety and Health Administration ("OSHA") and Compressed Gas Association standards. However, "The Occupational Safety and Health Act, which provides the legislative grant of authority to OSHA, specifically states that it is not intended to affect the civil standard of liability. . . . To use OSHA regulations to establish whether a product is unreasonably dangerous is thus improper." *Minichello v. U.S. Industries, Inc.*, 756 F.2d 26, 29 (6th Cir. 1985). *But cf. Rexrode v. American Laundry Press Co.*, 674 F.2d 826, 832 (10th Cir. 1982)(assuming the relevance of OSHA standards in context of feasibility of safer product design); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985)(taking judicial notice of pertinent OSHA guidelines); *Lorenz v. Celotex Corp.*, 896 F.2d 148, 151 (5th Cir. 1990)(compliance with government safety standards constitutes strong and substantial evidence that a product is not defective, but is not automatically preclusive of the issue of liability). We disagree with the reasoning of *Minichello* and instead adopt the approach of these other courts. We therefore find the violations of OSHA and Compressed Gas Association standards relevant as to the level of knowledge to which a dealer of such gases should be held.

In judging the effectiveness of a warning, most courts, interpreting Restatement (Second) of Torts § 402A comment i or § 388 comment k,[5] have held that it is necessary to take into account the parties towards whom the warning is directed. "Where, for example, a product is marketed solely to professionals experienced in using the product, the manufacturer may rely on the knowledge which a reasonable professional would apply in using the product." *Borel*, 493 F.2d at 1087 n.20.

It is relatively clear that, in some instances, the expertise of the consumer may be sufficient to completely obviate the need for a warning. There are several cases sufficient to support the statement that the manufacturer's or seller's duty to warn is unnecessary when the consumer is an expert who has or should have knowledge of the dangers of the product. *See, e.g., Jacobson v. Colorado Fuel and Iron Corp.*, 409 F.2d 1263, 1271 (9th Cir. 1969) (applying Montana law); *Martinez v. Dixie Carriers*, 529 F.2d 457, 466 (5th Cir. 1976) (in admiralty); *In re Incident Aboard D/B Ocean King on 8/30/80*, 813 F.2d 679, 686 (5th Cir. 1987) (in admiralty); *Helene Curtis Industries v. Pruitt*, 385 F.2d 841, 860 (5th Cir. 1967) (applying Texas law); *White v. Amoco Oil Co.*, 835 F.2d 1113, 1118 (5th Cir. 1988) (applying Louisiana law); *Koonce v. Quaker Safety Products & Mfg.*, 798 F.2d 700, 716 (5th Cir. 1986) (applying Texas law); *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d

---

[5] Section 402A comment i states that, for a product to be unreasonably dangerous, it must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Section 388 comment k states:

> One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him . . . but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved.

*See supra* note 3.

682, 686 (8th Cir. 1981) (applying Nebraska law); *Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir. 1991) (applying New York law).

In addition, courts have held that a manufacturer need not warn of an "open and obvious danger" associated with their products. "A manufacturer is under no duty to guard against injury from a patent peril or from a source that is manifestly dangerous. There is no duty to warn of obvious common dangers connected with the use of a product." *Pressley v. Sears-Robuck and Co.*, 738 F.2d 1222, 1223 (11th Cir. 1984) (applying Georgia law). "[A] product is not defective if the peril from which injury could result is patent or obvious to the user." *Wilson v. Bicycle South, Inc.*, 915 F.2d 1503, 1507 (11th Cir. 1990) (applying Georgia law). This rule, however, has been explicitly rejected by other courts. *See, e.g., Lovell v. Marion Power Shovel Co.*, 909 F.2d 1088, 1090 (7th Cir. 1990) (under Indiana law, "open and obvious" rule does not act as an absolute bar to recovery); *Harris v. Karri-On Campers, Inc.*, 640 F.2d 65, 76 (7th Cir. 1981) (West Virginia law rejects the "seldom used and often criticized" obvious-danger doctrine). The "open and obvious" doctrine seems to be nothing more than a variant of the "expert user" defense with a lower standard of knowledge on the user's part. *See, e.g., Gracyalny*, at 1319 (status of the user determines whether the danger is "open and obvious").

Application of either the "open and obvious" or the "expert user" doctrines, however, should be made cautiously, for they fully preclude recovery by the injured party and resemble the application of the "all-or-nothing" defenses of assumption of risk and contributory negligence, which have been definitively rejected by courts sitting in admiralty. *See, e.g., National Marine Service*, 736 F.2d at 276 ("all-or-nothing" defenses, including assumption of risk and contributory negligence are inequitable in their operation because they fail to distribute responsibility in proportion to fault; comparative fault should be applied instead). In fact, the "expert user" defense can be viewed as more draconian than assumption of risk. Unlike the latter defense which requires the plaintiff's actual consciousness of the danger, *id.* at 276, the "expert user" defense merely requires that "manufacturers need not warn sophisticated users of dangers that they *should* know of," *White v. Amoco Oil Co.*, 835 F.2d 1113, 1118 (5th Cir. 1988) (emphasis added), a much less demanding showing. *But see In re Incident Aboard D/B Ocean King*, 813 F.2d at 686 (sophisticated-user defense applies "only when the user knew of the particular danger"). Indeed, inquiry into what a plaintiff should know would unavoidably devolve into a contributory negligence analysis. This latter doctrine has been specifically rejected as

91

a defense to strict products liability actions. *See* § 402A comment n ("Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence.").[6] *But see Up-Right Scaffolds*, 637 F.2d at 815 (contributory negligence, assumption of risk and misuse are not always interchangeable). Contributory negligence as a bar to recovery has also been explicitly rejected by the Legislature of American Samoa. A.S.C.A. § 43.5101.

Under the comparative-fault approach, which we adopt today, the knowledge of the user is not disregarded. It is, rather, one element in the calculus of liability determination. This approach eliminates the inequities which "all-or-nothing" defenses can perpetuate but does not reject the rationale behind these rules. Indeed, if the court were to find the user of a product to be inexcusably ignorant, the result under comparative fault might be the same as that resulting from the "expert user" or "open and obvious" danger defenses.

While Samoa Gases attempted at trial to establish that it did, in fact, label the cylinders supplied to the Ocean Pearl, its trial brief focused on the defense of misuse, the successful establishment of which precludes a finding of duty.[7] This will be considered further below.

One additional consideration in the instant case is the ease and minimal costs involved in labelling the cylinders. Although it discussed defective design rather than failure to warn, *Vickers*, 822 F.2d 535, seems relevant. The plaintiff in *Vickers* was a seaman who was attaching a large air-compressor to a crane, in the process of removing it from a ship. He climbed onto the roof of the air compressor, attached the hook of the crane to the lifting-eye of the compressor, then fell while jumping back down to the deck of the ship. In his suit against the manufacturer of the air compressor, the court, sitting in admiralty, found the

---

[6] Section 402A comment n does specifically accept the defense of assumption of risk; however, this defense has been thoroughly rejected by courts sitting in admiralty. *See, e.g., Pan-Alaska Fisheries*, 565 F.2d 1129 (rejecting defense of contributory negligence in favor of comparative fault paradigm in strict products-liability actions in admiralty).

[7] *See Jones v. Menard*, 559 F.2d 1282, 1285 (5th Cir. 1977) (seller has no duty to warn against unforeseeable uses of its products).

compressor to be defectively designed, solely because it did not bear any notice of its internal access to the lifting eye. "[T]o decide whether a product is defectively designed and unreasonably dangerous, we may consider how easily the manufacturer could have designed a safer alternative product. . . . [The manufacturer] easily could have attached a notice to the compressor, explaining the availability of the interior access to the roof." *Id.* at 539. This balancing of ease and cost of improvement is relevant here, for in failure to warn actions, as in *Vickers*, it is the failure to communicate information about the product which is the essence of the tort.

## V. *Misuse*

A seller obviously cannot warn of every possible use. "A product is not in a defective condition when it is safe for normal handling and consumption." § 402A comment h. "[I]n admiralty cases, the 'normal' use includes all reasonably foreseeable uses, including misuse. This is the virtually universal rule in all states." *Vickers*, 822 F.2d at 537. The Ninth Circuit, applying California law, said, "A plaintiff may recover from the manufacturer even if the product is used in a manner not intended by the manufacturer, and therefore unanticipated by warnings or other instructions, *if* the unintended manner of use is reasonably foreseeable to the manufacturer." *Kay v. Cessna Aircraft*, 548 F.2d 1370, 1372 (9th Cir. 1977) (citations omitted) (emphasis in original).[8]

Misuse, like assumption of risk, is a negligence concept. *Stueve v. American Honda Motors Co., Inc.*, 457 F. Supp. 740, 752 (D. Kan. 1978). Therefore, like assumption of risk and contributory negligence, it should properly be subsumed under the doctrine of comparative fault. Although the court has not found any admiralty decision which specifically held that misuse was to be supplanted by or factored into the comparative-fault calculus, several courts not sitting in admiralty have suggested as much. *See, e.g.*, *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F. Supp. 598, 603 (D. Idaho 1976) ("rationale of comparative negligence was meant to apply as well in a products liability action, such that misuse may not be an absolute bar to recovery"); *DeLeon v. Commercial Mfg. and Supply Co.*, 195 Cal. Rptr. 867, 872

---

[8] This is consistent with the idea that foreseeable change in the condition of the product will not relieve the seller of liability. *See, supra*, Section IV.A.

(Cal. App. 1983) ("[E]ven if plaintiff's acts could be considered misuse of the product and contributory negligence, this would not foreclose an action in products liability but only reduces any award she might receive in an amount proportionate to the degree she is deemed to be at fault."). *Cf. Courturier v. Heidelberger Druckmaschinen*, 341 N.W.2d 226, 228 (Mich. App. 1983) (misuse not a complete defense to breach of warranty action). *See generally*, Annotation, *Products Liability: Product Misuse Defense*, 65 A.L.R.4th 263 (1988).

The reasoning of these last cases seems confused, however. If misuse is to be defined as unforeseeable use only, then rejecting it as a complete defense to liability removes the foreseeability issue from failure-to-warn cases and transforms them into actions based upon absolute liability. This would require the manufacturer or seller to warn of dangers of which it did not, and could not, know.[9] This conundrum is the result of semantics. In order for the label "misuse" to have any meaning at all independent of contributory negligence, the application of that label to a plaintiff's conduct must always serve as a complete bar to recovery.[10] The alternative is to impose absolute liability upon manufacturers and sellers for their products. This is not only contrary to the case law cited above in section IV.B., but would also make manufacturers absolute insurers of their products if used in an unforeseeable manner, and would ultimately result in wasted time as litigants argued over the proper label to apply to a plaintiff's conduct.

The better method, and the one which we adopt today, is to do away with labels altogether and simply weigh the fault of Samoa Gases directly against that of all other causal parties. This is essentially the approach advocated by the Ninth Circuit for admiralty cases in its jurisdiction. "[A]ll of plaintiff's conduct contributing to the cause of his loss or injury can be compared to the defendants' liability, regardless of the labels attached to that conduct." *Pan-Alaska Fisheries*, 565 F.2d at

---

[9] "[I]f a danger is unknowable, how can effective warning be given? To warn that a product may have unknown and unknowable risks is to give no meaningful warning at all." *Anderson*, 799 F.2d at 4.

[10] Some jurisdictions not applying comparative fault principles have defined misuse in terms of foreseeability, such that it would serve as a complete bar to recovery. *See* Annotation, *Products Liability: Product Misuse Defense*, 65 A.L.R.4th 263, 295, at § 8 (1988), and cases cited therein. We reject this approach as incompatible with comparative fault.

1139.  This seems to be the most consonant with the paradigm of comparative fault.  If the conduct of the Ocean Pearl's crew was completely unforeseeable (i.e., constituted misuse), then the scales would fall completely in favor of Samoa Gases, and there would be no liability and no recovery.  This approach has been taken by at least two states.  *See Kennedy v. City of Sawyer*, 618 P.2d 788, 798 (Kan. 1980); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 428 (Tex. 1984).

However, it is still necessary to address the real issue which the misuse defense targets.  Translated into the language of comparative fault, this question is: Even if the standard label warning of the hazards of exposing oxygen to petroleum products was present, would it have prevented the accident at hand?  The principles of comparative fault again help frame this issue, through the concept of proximate cause.

## VI.  *Proximate Cause*

Proximate cause, like misuse, contributory negligence and assumption of risk, has been melded with the concept of comparative fault.  Indeed, the Ninth Circuit has stated that "perhaps the term 'comparative causation' is a conceptually more precise term than 'comparative fault,' since fault alone without causation does not subject one to liability."  *Pan-Alaska Fisheries*, 565 F.2d at 1139 (citing *Sun Valley Airlines*, 411 F. Supp. at 603).  *See also Duncan*, 665 S.W.2d at 427 (comparative causation more accurate than comparative fault); *Lewis*, 716 F.2d at 1431 (same); *Butaud v. Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42, 47 (Alaska 1976) (Rabinowitz, J., concurring) (same); *Daly v. General Motors Corp.*, 144 Cal. Rptr. 380, 386 (1978) ("equitable apportionment or allocation of loss" more descriptive than "comparative fault").  In short, once the legal fault of Samoa Gases is established, then its actions are to be weighed against all other causal factors, and liability is to be assigned upon this basis.  Thus, having found Samoa Gases at fault for failure to label, we need only to decide, for the purposes of the first part of this bifurcated trial, whether the failure to label the cylinders played *any* causal role in the accident.  Interocean alleges that Richard Gonsalves, chief engineer of the Ocean Pearl, read the label on the can of starter fluid, and would have done the same for the oxygen cylinders.  We are inclined to agree.  Thus, the failure to label was, at least, *a* proximate cause of the accident, to be weighed against the conduct of the other causal actors (i.e., the crew of the Ocean Pearl, the suppliers of the diesel fuel and the ether-based starter fluid).

# CONCLUSIONS

Having enunciated the approach we have taken in this case, and based on the foregoing findings of fact, we conclude as follows:

1. Since (a) the oxygen cylinders supplied by Samoa Gases to the Ocean Pearl did not have a warning label adhered to them (i) at the time of delivery, or (ii) immediately prior to the explosion, a reasonably foreseeable condition at that time, and (b) the unlabelled cylinders were unreasonably dangerous, and (c) the lack of labels was a proximate cause of the accident aboard the vessel, Samoa Gases is liable to Interocean.

2. Since some of the crew of the Ocean Pearl were experienced in the use of oxygen, at least for welding purposes, and should have known of the danger of using it in the circumstances which brought about the explosion, the crew and, therefore, Interocean also bear some significant quantum of responsibility for the accident.

Determination of the exact percentages of fault to be assigned to each party will be made after the second part of this bifurcated trial, which will specifically address the issue of damages. The causal role of the suppliers of the diesel fuel and the starter fluid will be considered at that time.